EXHIBIT
2

FILED

AUG 2 2 2005

NANCY MAYER WHITTINGTON CLERK
U.S. DISTRICT COURT

David Sieverding

Kay Sieverding

Ed Sieverding, and

Tom Sieverding

v

**In the United States District Court**

**Of The District of Columbia**

Jury Demand    CASE NUMBER 1:05CV01672

JUDGE: Ricardo M. Urbina

DECK TYPE: Personal Injury/Malpractic

DATE STAMP: 08/22/2005

**American Bar Association**, AKA ABA, and their insurance company (true name unknown); 740 15ᵗʰ St. Northwest. Washington D.C. 20005, 202-862-1000.

**Jane Bennett,** private citizen acting in conspiracy with City policy makers. (Kevin Bennett's wife) 701 Princeton Ave., Steamboat Springs, CO, 80477 (unpublished phone).

**Kevin Bennett**, individually and in capacity as former CITY Council member City of Steamboat Springs, CO, PO 775088, 124 10ᵗʰ St. Steamboat Springs, CO 80477, attn. city clerk Julie Jordan 970-879-2060.

**Ken Brenner**, individually and as a CITY Council Member; City of Steamboat Springs, CO, PO 775088, 124 10ᵗʰ St. Steamboat Springs, CO 80477, attn. city clerk Julie Jordan 970-879-2060.

**David Brougham**, individually and in capacity as apparent CITY insurance agent (for CIRSA) Hall and Evans LLC, 1125 17ᵗʰ St. #600, Denver, CO 80202 303-628-3300. A law firm that was both defense counsel and defendant in preceding related litigation 02-1950.

**Colorado Bar Association**, AKA CBA, and their insurance company (true name unknown); 1900 Grant St., Suite 900, Denver, CO 80203 303-860-1115.

**City of Steamboat Springs**, CO, a local government recognized by the State of Colorado as a Colorado "city" (hereinafter CITY); PO 775088, 124 10ᵗʰ St. Steamboat Springs, CO 80477, attn city clerk Julie Jordan 970-879-2060.

1

**Kathy Connell**, individually and as employed as CITY Council Member, City of Steamboat Springs, CO); PO 775088, 124 10th St. Steamboat Springs, CO 80477, attn city clerk Julie Jordan 970-879-2060.

**James Engleken**, individually and in capacity as former CITY Council Member; City of Steamboat Springs, CO, PO 775088, 124 10th St. Steamboat Springs, CO 80477, attn city clerk Julie Jordan 970-879-2060.

**Art Fiebing**, individually and in capacity as recently retired CITY chief of police/AKA police captain; City of Steamboat Springs, CO, PO 775088, 124 10th St. Steamboat Springs, CO 80477, attn city clerk Julie Jordan 970-879-2060.

**Sandy Fiebing**, individually and as the former CITY planning department code enforcement officer; City of Steamboat Springs, CO, PO 775088, 124 10th St. Steamboat Springs, CO 80477, attn city clerk Julie Jordan 970-879-2060.

**Daniel Foote**, individually and in capacity as Assistant CITY attorney; City of Steamboat Springs, CO, PO 775088, 124 10th St. Steamboat Springs, CO 80477, attn city clerk Julie Jordan 970-879-2060.

**J.D. Hays** individually and in capacity as CITY director of public safety; City of Steamboat Springs, CO, 124 10th St. Steamboat Springs, CO 80477, attn city clerk Julie Jordan 970-879-2060.

**Hall and Evans LLP** and their insurance. 1125 Seventeenth St. Suite 600, Denver CO 80206, 303-628-3300

**James "Sandy" Horner,** individually and as an attorney working for Klauzer & Tremaine LLP and his insurance company, 320 S. Lincoln Ave, Steamboat Springs, CO 80487-8906 970-879-5003

2

**Paul Hughes**, individually and in capacity as CITY manager; City of Steamboat Springs, CO, PO 775088, 124 10th St. Steamboat Springs, CO 80477, attn city clerk Julie Jordan 970-879-2060

**Klauzer & Tremaine, LLC** a law firm, and insurance (true name unknown). 320 S. Lincoln Ave, Steamboat Springs, CO 80487-8906, 970-879-5003.

**Randall Klauzer,** individually and in capacity as an attorney and his insurance company 320 S. Lincoln Ave, Steamboat Springs, CO 80487-8906 970-879-5003

**Charles Lance,** his insurance through the State of Colorado and claims administered thru the Colorado Department of Law, 1525 Sherman St. Denver, CO. 303-866-5687, fax 303-866-5443,

**Anthony Lettunich**, individually and in capacity as CITY attorney and his insurance City of Steamboat Springs, CO, PO 775088, 124 10th St. Steamboat Springs, CO 80477, attn city clerk Julie Jordan 970-879-2060

**Paul R. McLimans** individually and in capacity as a former district attorney and his insurance pool thru State of Colorado, PO 770129, 522 Lincoln Ave, Steamboat Springs, CO, 80477, phone 970-879-1146 and fax 970-879-6276.

**Wendie Schulenburg, (A.K.A Wendie Rooney)** individually and in capacity as former CITY planning services director; and her insurance through Colorado Intergovernmental Risk Sharing "Agency" and/or State of Colorado. City of Steamboat Springs, CO, PO 775088, 124 10th St. Steamboat Springs, CO 80477, attn city clerk Julie Jordan 970-879-2060

3

**Melinda Sherman,** former Assistant CITY attorney, individually, and in capacity, and

her insurance City of Steamboat Springs, CO, PO 775088, 124 10th St. Steamboat

Springs, CO 80477, attn city clerk Julie Jordan 970-879-2060.

**Kerry St. James,** individually and in capacity as deputy or assistant district attorney; and

his insurance through the State of Colorado claims pool, PO 770129, 522 Lincoln Ave,

Steamboat Springs, CO, 80477; phone 970-879-1146 and fax 970-879-6276.

**James B.F. Oliphant,** Bennett's attorney and purchaser of plaintiff's home. He is listed

as an attorney partner in the Routt County Colorado firm of Feldmann, Nagel & Oliphant

919 Oak St Steamboat Springs CO 80477 970 879 8616. Plaintiffs attempted to have him

served there last week by the Routt County Sheriff but the sheriff reported that the office

told them that Mr. Oliphant has moved to an unknown location in New Jersey. He did not

leave a forwarding address with the federal court in Colorado and their last mailing to

him was returned. Plaintiffs are attempting to locate him.

**Suzanne Schlicht,** individually and in capacity as newspaper publisher as an agent for

The Steamboat Pilot and Today AKA The World Company, 1901 Curve Plaza Steamboat

Springs CO 80487, 970-879-1502.

**Steamboat Pilot & Today Newspaper AKA The World Company,** WorldWest

Limited Liability Company and Lawrence Journal World, and insurance (true name

unknown)  609 New Hampshire. P.O. 888, Lawrence, Kansas 66044. 785-843-1000

**Arianthe Stettner,** individually and in capacity as CITY council member PO 775088,

124 10th St. Steamboat Springs, CO 80477, attn city clerk Julie Jordan 970- 879-2060.

4

**Paul Strong**, individually and in capacity as CITY Council Member; and his insurance company  PO 775088, 124 10th St. Steamboat Springs, CO 80477, attn city clerk Julie Jordan 970- 879-2060.

**Richard Tremaine,** individually and in capacity as an attorney; and his insurance company CIRSA 320 S. Lincoln Ave, Steamboat Springs, CO 80487-8906, 970-879-5003.

**James Weber**, individually and in capacity as CITY public works director; and his insurance PO 775088, 124 10th St. Steamboat Springs, CO 80477, attn city clerk Julie Jordan 970-879-2060.

**P. Elizabeth Wittemeyer,** individually and in former capacity as Deputy District attorney; and her insurance through the State of Colorado and claims administered thru the Colorado Attorney General's office, 330 S. Lincoln Ave, Suite 222, PO 770908, Steamboat Springs, CO 80477-0908 970-879-5532.

_Complaint_

## JURISDICTION

The United States District Court for the District of Columbia has subject matter jurisdiction because the district courts have original jurisdiction or all civil actions arising under the Constitution, laws or treaties of the United States (28 U.S.C. Sec 1391) and also because it has jurisdiction over the parties based on 28 U.S.C.Sec.1332 (a) (1) because the plaintiffs live in Wisconsin, to the best of plaintiffs' knowledge none of the defendants live in Wisconsin, the defendant who is most influential in recent events is located in the District of Columbia, and the amount of controversy is over $75,000.

## FACTS

1.) The plaintiffs filed the complaint with numbered facts 2 to 419 below in the District of Colorado. This case was litigated from January 2003 to May 2005. During that time, the facts 2 to 416 were not disputed by the defense, nor were any other facts presented by plaintiffs disputed by the defense, nor was the $15 million plus interest estimate of the dollar value of plaintiffs' claim. In the 02-1950 litigation, plaintiffs repeatedly verified the complaint facts below under penalty of perjury and submitted them also in motions for summary judgment. They supported the 02-1950 complaint facts with an initial 750 + page of document evidence admissible under the federal rules of evidence consisting mostly of county court documents, verifiable photographs, letters undisputed by the defense, and many documents collected under the Freedom of Information Act. The defendants did not file "Answers" or "Replies". They did not file any affidavits. They did not file a statement of stipulated facts nor disputed facts. They did not convene a case management conference. They refused to have conferences as required and anticipated by the rules and notice pleadings. They refused to respond to interrogatories, even when filed as motions. All of the defendants in 02-1950 that were served are included in this filing. The defendants in the 02-1950 action did not move to add any additional defendants. The facts below are therefore now undisputable in law because the 02-1950 defendants had plenty of time to produce affidavits contradicting their truth:

2.) Undisputable02-1950fact(1-2)(for numbering consistency) "The American Bar Association (ABA) voluntarily assumed the role of representing the American legal industry. The ABA voluntarily created a unique role for itself in developing guidelines

6

for law school, model regulation standards for attorney ethics, and criteria for licensing lawyers."

3.) Undisputable02-1950fact3 "In voluntarily acting as a representative of the legal industry in America, the ABA acted to advance industry profits and also created an organization with high paying jobs."

4.) Undisputable02-1950fact4 "By its actions and representations, the ABA acted to prevent the creation of an alternative national industry association representing attorneys in America."

5.) Undisputable02-1950fact5 "The ABA voluntarily assumed responsibility for the ethical standard of the American attorney services industry."

6.) Undisputable02-1950fact6 "Following its voluntary assumption of responsibility for protecting the public from potential harm caused by attorney tortfeasors, the ABA acted affirmatively to prevent government regulation of the attorney services industry."

7.) Undisputable02-1950fact7 "The ABA acted affirmatively to prevent government regulation of the attorney services industry by developing the model Rules of Professional Conduct, creating a lot of committees, having a lot of conferences, and publishing a lot of materials."

8.) Undisputable02-1950fact8 "The ABA deceitfully claims that fear of lawsuit is not needed to prevent attorneys from acting in a tortuous manner...because (attorneys) are educated not to act in a tortuous manner, they are more moral and honest than other people, other lawyers will observe them and stop the tortuous behavior, and state organizations will 'discipline' them by suspending their license."

9.) Undisputable02-1950fact9 "The education of lawyers in law schools approved by the ABA with curricula standards set by the ABA is not adequate to prevent lawyers from frequently acting in a tortuous manner."

10.) Undisputable02-1950fact10 "The state organizations that 'discipline' attorneys…are not accountable to the public."

11.) Undisputable02-1950fact11 "The CO Attorney Discipline Board does not prevent nor remedy tortuous conduct by attorneys".

12.) Undisputable02-1950fact12 "Other lawyers don't adequately prevent attorneys from tortuous actions towards non-clients and adversaries."

13.) Undisputable02-1950fact13 "Because attorneys are so seldom sued for their tortuous actions towards non-clients and adversaries and the state organizations are ineffective in preventing tortuous conduct by attorneys, they are not adequately deterred from being tortfeasors."

14.) Undisputable02-1950fact14 "Policy makers at the ABA know that lawyers are not adequately deterred from being tortfeasors but don't acknowledge it."

15.) Undisputable02-1950fact15 "Policy makers at the ABA know that statistically few lower and middle class people who are damaged by attorney tortfeasors get remedy but avoid acknowledging this publicly because they don't want government regulation of the industry."

16.) Undisputable02-1950fact16 "ABA acts of omission reduce availability of tort remedy to lower and middle class people damaged by attorney tortfeasors."

17.) Undisputable02-1950fact17 "The ABA pretends that it is not responsible for its acts of omission nor for delegating its non-delegable duties."

8

18.) Undisputable02-1950fact18 "The Colorado Bar Association (CBA) includes about 14,000 of about 17,000 Colorado lawyers."

19.) Undisputable02-1950fact19 "Only licensed lawyers can join the CBA and can read most of the information on the web site or attend their conferences."

20.) Undisputable02-1950fact20 "The CBA had policies and acts of omission inhibiting many victims of attorney tortfeasors from suing for damages."

21.) Undisputable02-1950fact21 "Neither the ABA nor CBA, define or even discuss a standard that, if breached, allows a lawyer to be sued."

22.) Undisputable02-1950fact22 "The CBA has an ethics committee, which publishes about 110 opinions for the guidance of their lawyer members."

23.) Undisputable02-1950fact23 "None of the listed subjects of the CBA ethics committee opinions include remedy for victims of attorney tortfeasors."

24.) Undisputable02-1950fact24 "CBA publishes one article on liability of accountants to non-clients but no articles on liability of lawyers to non-clients."

25.) Undisputable02-1950fact25 "Lawyers, rarely if ever, disclose that under industry practice they are allowed to engage in deceit to benefit their customers."

26.) Undisputable02-1950fact26 "The ABA and CBA publications do not advise disclosure of lawyers widespread belief they have immunity."

27.) Undisputable02-1950fact27 "The 1908 ABA canons of ethics provided that a lawyer discovering a fraud or deception should attempt to persuade the client to rectify the matter, but if unable to do so, the lawyer should promptly inform either the injured party or his lawyer."

28.) Undisputable02-1950fact28 "In 1983 the ABA revised their model of professional ethics with the Model Rules of Professional Conduct."

29.) Undisputable02-1950fact29 "The model adopted by lawyers who work for the Colorado Courts, after lobbying on its behalf by the CBA, says lawyers could reveal fraud on a person or a tribunal only when necessary to prevent assisting a person's wrongdoing."

30.) Undisputable02-1950fact30 "Lawyers in this pleading did not reveal frauds though necessary to prevent more fraud, abuse of process, theft, libel, etc."

31.) Undisputable02-1950fact31 "Especially since the ABA and CBA changed their ethics codes so as to eliminate the requirement that lawyer disclose fraud, it has become extremely rare that a lawyer sues another lawyer for cash compensation for damages for deceitful actions."

32.) Undisputable02-1950fact32 "The CBA and ABA imply that their ethics codes are adequate to protect the public because if a lawyer finds out that another lawyer was involved with fraud they are supposed to tell "appropriate authorities"."

33.) Undisputable02-1950fact33 "The CBA refers people who complain about lawyers to the CO Office of Attorney Regulation Counsel."

34.) Undisputable02-1950fact34 "The CO Office of Attorney Regulation Counsel...gets about 4,500 annual complaints."

35.) Undisputable02-1950fact35 "The Office of Attorney Regulation never has to answer questions from the public nor the legislature about how it conducts its operations or its policies or questions about its policies and management from anyone except the lawyers who fund it."

36.) Undisputable02-1950fact36 "Literature of the CO Office of Attorney Regulation Counsel does not even discuss problems with lawyer tortfeasors."

37.) Undisputable02-1950fact37 "The CO Office of Attorney Regulation Counsel does not do any investigation and says it will only consider disbarring or punishing a lawyer unless a judge has already ruled that a lawyers did something illegal or unethical." (This is what Matt Samuelson of the CO Office of Attorney Regulation Counsel told plaintiffs)

38.) Undisputable02-1950fact38 "The Sieverdings three times communicated with the CO Office of (Attorneys) Regulation Counsel and said they could prove use of subordened perjury and official misconduct, twice talking personally to attorney Matt Samuelson; he said couldn't investigate."

39.) Undisputable02-1950fact39 "In order to get a judge to rule that an attorney lied in court, got witnesses to lie under oath, libeled someone, wrote letters including lies, deceit, or fraud, or did something else unfair or illegal, one has to file a lawsuit against the lawyers."

40.) Undisputable02-1950fact 40 "The last four and next facts are not disclosed on the CO Office of Attorney Regulation Counsel publications."

41.) Undisputable02-1950fact41 "Lawyers in CO and America have an informal policy of not suing lawyers on behalf of middle class people damaged because the lawyers lied in court, got witnesses to lie, libeled them, or helped their client cheat them or commit a crime."

42.) Undisputable02-1950fact42 "The ABA and CBA had this brought to their attention by the McGee Commission Report in 1982, also called 'Lawyers Regulation for A New




Century' which noted that citizens have claimed it is difficult to get a lawyer to sue a lawyer."

43.) Undisputable02-1950fact43 "There has been little, if any, public discussion by the ABA and CBA of whether citizens can get a lawyer to sue a lawyer."

44.) Undisputable02-1950fact44 "Although 20 years passed, the ABA and CBA have done nothing to remedy that defect even though citizens are more vulnerable to attorney tortfeasors now because of weakening of protections through the Rules of Professional Conduct and the 1984 granting of total judicial immunity even in cases of malice, bribery, and government corruption."

45.) Undisputable02-1950fact45 "Textbooks on torts used in ABA accredited law schools have not been updated to include the tort of attorney misconduct." (Note, this is the only fact that plaintiffs withdrew from the 02-1950 filing. Dobbs, The Law of Torts, West Hornbook, discusses attorney liability in tort and the Dobbs book is used in many law schools. Attorney liability in tort is settled law not cutting edge law. The Cal Supreme Court ruled on the subject in 1958 and there are many cases on the subject.)

46.) Undisputable02-1950fact46 "The McGee Commission and the ABA's Lawyers Regulation for a New Century recommend that bar associations develop a brochure about attorney misconduct and distribute it in court houses, libraries, and social service agencies."

47.) Undisputable02-1950fact47 "No such brochures were apparently ever written or distributed around Steamboat Springs or elsewhere in CO."

12

48.) Undisputable02-1950fact48 "A divorced men's association web site claims that half of all domestic restraining orders are illegitimate and obtained to get financial benefit in marriage dissolution or child custody advantage."

49.) Undisputable02-1950fact49 "Randall Klauzer, defendant and tortfeasor, has a divorce practice, which obtains domestic restraining orders."

50.) Undisputable02-1950fact50 "The brochures may have encouraged earlier complaints about Klauzer and changed his conduct."

51.) Undisputable02-1950fact51 "The reckless indifference of policy makers at the ABA and CBA to the special vulnerability, to attorney misconduct and attorney deceit, of people, who were not represented by an attorney, is partially class-based prejudice."

52.) Undisputable02-1950fact52 "The ABA and CBA have a goal of expanding industry sales and profits by informally pressuring middle class citizens to hire attorneys at $200 per hour for divorces, child custody disputes, and dealings with local government."

53.) Undisputable02-1950fact53 "Colorado Magistrate Judge Schlatter advised the plaintiffs to hire a lawyer to prevent other lawyers from lying to them."

54.) Undisputable02-1950fact54 "The Sieverdings found that because they have been victimized by lawyers deceit and other torts while they were working for their adversary, a corrupt politician Kevin Bennett, it was impossible to get a lawyer to prosecute their case broadly because they didn't want to risk the marketing advantages of their private law service businesses."

55.) Undisputable02-1950fact55 "Any discouragement of lawyers from representing clients who have been hurt by attorney torts is discriminatory."

13

56.) Undisputable02-1950fact56 "People such as the Sieverdings who can't hire an attorney because they were victims of another attorney are more vulnerable to being hurt again by attorneys and cannot get payments for their injuries nor other remedy."

57.) Undisputable02-1950fact57 "The lawyers who deliberately hurt the Sieverding family as described herein weren't afraid of getting sued for their behavior no matter how much evidence Kay Sieverding collected or how strong her case was."

58.) Undisputable02-1950fact58 "Because the group of lawyers in Steamboat Springs who hurt the Sieverdings wasn't afraid that they would get sued for it, they and their cronies used deceit and hurt the Sieverdings again and again."

59.) Undisputable02-1950fact59 "Only the ABA and the CBA or the state legislature could have prevented the Sieverdings from being vulnerable to lawyers, politicians, and CITY staff associated with a corrupt politician, Kevin Bennett, from hurting them again and again."

60.) Undisputable02-1950fact60 "The policy makers at the ABA and the CBA implied to their friends in state government that regulation of attorneys is unnecessary; a large number of state government policy makers are themselves attorneys."

61.) Undisputable02-1950fact61 "The ABA and the CBA repeatedly implied to the public and the government in many different ways that the industry was 'self-regulating' and didn't acknowledge that people like the Sieverdings who are hurt by lawyer tortfeasors even exist."

62.) Undisputable02-1950fact62 "The whole time the ABA and CBA were proclaiming that the legal industry was "self-regulating" their managers knew that some attorneys really were engaging in deceit and helping their clients illegally hurt people."

14

63.) Undisputable02-1950fact63 "The easiest most effective way to help people like the Sieverdings who are hurt by lawyers tortfeasors in the course of business, and prevent it in the first place, is for the ABA and the CBA to publicly announce that lawyers should sue other lawyers when someone wants to hire them because they were illegally damaged by another lawyers deceit, fraud, libel, etc."

64.) Undisputable02-1950fact64 "The highly paid managers of the ABA and CBA and their committees of other highly paid lawyers have deliberately chosen not to publicize even the possibility of lawyers suing lawyers tortfeasors on behalf of middle class attorney victims."

65.) Undisputable02-1950fact65 "Lawyers can be sued and have no immunity because the U.S. and CO legislature never passed a law saying they were immune and higher courts never made court decisions granting attorneys immunity— saying the public would not allow it."

66.) Undisputable02-1950fact66 "Lawyers and judges don't have to worry about public disapproval of informal agreements because the public won't know."

67.) Undisputable02-1950fact67 "Press discussion of legal practices is limited because the terms lawyers use are confusing to anyone who didn't study law."

68.) Undisputable02-1950fact68 "Lawyers are sued so seldom for tortuous conduct in their professional activities, that a federal magistrate judge, O.E. Schlatter, thought they were immune, despite 30 years of legal experience."

69.) Undisputable02-1950fact69 "Prosser and Keeton on Torts, the legal text used in core courses in law schools, says 'Even an entire industry, by adopting such careless methods

15



to save time, effort or money, cannot be permitted to set its own uncontrolled standard'."(5[th] edition chapter 5 p. 194).

70.) Undisputable02-1950fact70 "When Federal Magistrate Colorado Magistrate Judge Schlatter was asked 'Do you think that if an attorney knowingly lies in court to hurt you and succeeds, that they should be liable for that?' his answer was 'No'" (pre written reply oral conference, called by magistrate 1/30/03 transcript p.70-71)

71.) Undisputable02-1950fact71 "Colorado Magistrate Judge Schlatter said 'Even if the lawyer gives a false statement of the law or a false statement of the facts, I would have to sit here and look at you and say no claim' and 'if an attorney makes up something that you think is a lie, there's some likelihood that no they're not liable for that if they're representing a party that is opposed to your interest.'" (1/30/03 p 71)

72.) Undisputable02-1950fact72 "Asked again 'If an attorney makes a knowing false statement of law, you think they should have no liability?' Colorado Magistrate Judge Schlatter responded 'You have no claim against them for that.' (pre written reply oral conference called by magistrate 1/30/03 p 71-72)

73.) Undisputable02-1950fact73 "Despite the contrary findings of higher courts, Colorado Magistrate Judge Schlatter's statement shows the reality of law as practiced in Colorado, and as experienced by the Sieverding family, under the policies and omissions of the ABA and CBA."

74.) Undisputable02-1950fact74 "The ABA has allowed attorneys in its conferences and on its web site to advocate refusal of service to people who may sue for attorney malpractice, which by implication extends to disgruntled victims of attorney misconduct."

16

75.) Undisputable02-1950fact75 "About 200 lawyers knew that the Sieverdings were hurt by lawyers deceit, but none would help."

76.) Undisputable02-1950fact76 "Even the 100 lawyers working for Davis, Graham & Stubbs, whose partner was president of the CBA at the time, would not help the Sieverding family when told about the attorneys' crimes and deceit, which hurt the family."

77.) Undisputable02-1950fact77 "All of the damages that the Sieverdings suffered could have been stopped if the lawyers had revealed deceit they knew about as it was committed and refused to engage in active and passive deceit as required by the Rules of Professional Conduct."

78.) Undisputable02-1950fact78 "Kevin Bennett is a corrupt politician who lived across the street from the Sieverdings with his wife Jane Bennett."

79.) Undisputable02-1950fact79 "Through events described herein the Bennetts were able to get about 5000 square feet of valuable resort land for $1."

80.) Undisputable02-1950fact80 "Through events described herein Kevin and Jane Bennett were able to build more buildings closer to the street on their land in violation of the CITY zoning and development laws than they would have if they followed the CITY laws."

81.) Undisputable02-1950fact81 "From the mid 90s to the present, CITY attorney Anthony Lettunich failed to perform his city attorney duties in order to help politician Kevin Bennett violate local and state laws."

82.) Undisputable02-1950fact82 "City manager, Paul Hughes, and city planners, Wendie Schulenburg and Tracey Hughes, lied to cover-up for Bennetts."

83.) Undisputable02-1950fact83 "The city code enforcement officer, Sandy Fiebing, didn't do her job on purpose to cover up for Bennetts."

84.) Undisputable02-1950fact "Sandy Fiebing, and (former) Police Chief Art Fiebing, may have been blackmailed by Kevin Bennett for possible past cocaine use."

85.) Undisputable02-1950fact85 "The CITY knew that there were allegations of drug use and/or drug dealing by Kevin Bennett and the police, as well as possible hiding of drug evidence by the police, but failed to implement safeguards developed elsewhere."

86.) Undisputable02-1950fact86 "Bennetts were paying customers of attorneys Oliphant, Tremaine, Horner, and Klauzer."

87.) Undisputable02-1950fact87 "These four lawyers used deceit to help the Bennetts blockade the street, acquire the street for free, build more volume than allowed by law, and build a house in a location not allowed by law."

88.) Undisputable02-1950fact88 "When the Sieverdings complained, the Bennetts, and their friends in local law enforcement stopped their complaints by twice criminally charging Mrs. Sieverding without a valid basis, used deceit to get a judge to say she was a credible threat to Jane Bennett, and claimed Kay Sieverding was a criminal and threatened her with jail repeatedly for bogus charges."

89.) Undisputable02-1950fact89 "District attorneys Wittemeyer, McLimans, Lance, and St James and police management J.D. Hays and Art Fiebing knew that crimes were committed in the process of the Bennetts "stealing" property rights and stopping the Sieverdings from petitioning government but in their reckless indifference and in informal civil conspiracy they allowed crimes to go uninvestigated and unpunished so as to further their careers and improve their job security."

18

90.) Undisputable02-1950fact90 "Then in July 2001 the local government policy makers violated the Sieverdings' constitutional rights by passing laws without government purpose to inhibit building of a duplex or an additional two houses, as allowed by the zoning, on Sieverdings' land and a different law so that they couldn't rent their house for enough to cover the mortgage."

91.) Undisputable02-1950fact91 "The CITY policy makers knew that these laws had no legitimate government purpose and would not affect other citizens."

92.) Undisputable02-1950fact92 "CITY policy makers and CITY planners described the new laws to the public in a deceitful fashion."

93.) Undisputable02-1950fact93 "In November 2001, James B.F. Oliphant bought Sieverdings' home for $100,000 less than it was appraised for."

94.) Undisputable02-1950fact94 "In 2000 to 2003, the Bennetts' friends in local government, the police, and the district attorneys' office conspired to stop an investigation of what happened or criminal charges for the felony perjury, felony issuing a false certificate, criminal libel, official misconduct and other crimes used to get the land, build against the zoning and development code, and cover up."

95.) Undisputable02-1950fact95 "In the summer of 2000, Kay Sieverding went to the Internet for help."

96.) Undisputable02-1950fact96 "Kay Sieverding found an ABA article on how governmental immunity did not extend to local government corruption and sent the citation to CITY policymakers."

97.) Undisputable02-1950fact97 "The ABA article on government corruption did not even mention a prophylactic role for city attorneys."

98.) Undisputable02-1950fact98 "In most or all lawsuits alleging discrimination by local government, the city attorney is not listed as a defendant."

99.) Undisputable02-1950fact99 "Every lawyer consulted by the Sieverdings said that city attorneys have no responsibility to the public."

100.) Undisputable02-1950fact100 "In fact, the public is the intended 3rd party beneficiary of city attorneys' contracts and implied contracts."

101.) Undisputable02-1950fact101 "City attorney Anthony Lettunich, assistant city attorneys Melinda Sherman and Daniel Foote, elected politicians Kevin Bennett, Arianthe Stettner, Paul Strong, James Engleken, Ken Brenner and Kathy Connell, and paid City professional staff Wendie Schulenburg (Roonie), Tracey Hughes, James Weber, Sandy Fiebing, Art Fiebing, and J.D. Hays were obligated by their implied contracts to ensure that the Sieverdings had equal protection under the law but they refused their obligations."

102.) Undisputable02-1950fact102 "The CITY spent a lot of money on lawyers who apparently advised the politicians is was OK to discriminate against the Sieverdings because they wouldn't "get caught" and would suffer no repercussions."

103.) Undisputable02-1950fact103 "Kay Sieverding gathered emails, letters, photographs, tape recordings, and transcripts proving CITY policy makers and local district attorneys' office discriminated on purpose, not by accident."

104.) Undisputable02-1950fact104 "The reason they discriminated it is that Steamboat Springs is such a small town with so few employers that they are all financially vulnerable and interdependent, desperate to keep their jobs, get new jobs, and develop and sell real estate."

105.) Undisputable02-1950fact105 "The CITY policy makers and district attorneys' office also had personal animus towards Kay Sieverding and David Sieverding because they were uppity and repeatedly disrespectful to government and the local judge."

106.) Undisputable02-1950fact106 "The CITY policy makers and district attorneys' office also feared Kay and David Sieverding because of the Sieverdings' pattern of trying to bring government corruption to the attention of the public and the justice system."

107.) Undisputable02-1950fact107 "Until they understood the events described herein, the Sieverdings didn't know they were at risk of attorneys' deceit and libel; they thought, as officers of the court, lawyers were obligated to be honest."

108.) Undisputable02-1950fact108 "In August 2000, Kay Sieverding emailed for advise to about 40 city planners across the country."

109.) Undisputable02-1950fact109 "In response to her email, the director of city planning for Ann Arbor, MI, called Kay Sieverding and advised her to go to Steamboat Springs' city attorney for help. She said the city attorney is supposed to stop people from building in violation of the laws and sounded surprised when Kay Sieverding told her that she had already tried the city attorneys."

110.) Undisputable02-1950fact110 "The Sieverdings couldn't make correct informed decisions about what to do when a corrupt politician and his lawyers victimized them because the ABA and CBA had misrepresented the industry as "self-regulating"."

111.) Undisputable02-1950fact111 "In 1991, the Sieverding family had bought a home with .71 acre across the street from property belonging to Bennetts."

112.) Undisputable02-1950fact112 "Kevin Bennett and Jane Bennett blockaded the road, Princeton Ave., in front of the Sieverdings' (former) house, including 60 feet of their

21

street frontage, for 8 years until they got the land for $1.00 after help from deceitful

actions by private attorneys Oliphant and nonfeasance and malfeasance by CITY

attorneys Sherman, Foote, and Lettunich."

113.) Undisputable02-1950fact113 "Blockading a street in Colorado is explicitly illegal,

with a $300/day potential fine."

114.) Undisputable02-1950fact114 "In the history of common law development from the

middle ages, a citizen blockading a road has never been legal."

115.) Undisputable02-1950fact115 "Government officials are not allowed to give a road

away except if it is evenly divided among adjoining neighbors."

116.) Undisputable02-1950fact116 "On 11/5/1992, the Bennett's attorney, James B.F.

Oliphant, wrote Kay Sieverding a deceitful letter claiming Bennett's street blockade was

legal and threatening their home based business with government prosecution."

117.) Undisputable02-1950fact117 "The deceitful letter from Oliphant allowed Bennetts

to justify the blockade."

118.) Undisputable02-1950fact118 "In the years following Oliphant's letter, the Bennetts

told neighbors and people in Steamboat Springs that they were having a "feud" with

Sieverdings and that Kay Sieverding was mentally ill or crazy."

119.) Undisputable02-1950fact119 "If the road blockade had not been allowed in

violation of equal rights laws, the Bennetts would not have had motivation to proclaim

that Kay Sieverding was mentally ill and that they were having a feud."

120.) Undisputable02-1950fact120 "There was no basis to Bennetts' claims that Kay

Sieverding was mentally ill or causing a feud."

22

121.) Undisputable02-1950fact121 "CITY attorneys, Anthony Lettunich, Melinda Sherman and Daniel Foote, CITY public works director James Weber, CITY manager, Paul Hughes, and the CITY council members were obligated to open the street blockade."

122.) Undisputable02-1950fact122 "The CITY policy makers knew the blockade was there and that Sieverdings objected."

123.) Undisputable02-1950fact123 "On 5/10/1995, Bennetts' son threatened Kay Sieverding if she should go behind the blockade."

124.) Undisputable02-1950fact124 "On 5/10/95 police chief received a detailed multi page report of the harassment and blockade and a detailed concerned letter from (a former Steamboat police officer who is not a defendant) but chose not to investigate though statute requires investigation of all harassment reports."

125.) Undisputable02-1950fact125 "City attorney Anthony Lettunich called Kay Sieverding in 1995 and said he could not stop the road blockade while Kevin Bennett was in local political office but that the blockade could be stopped after he left office, if she would be patient."

126.) Undisputable02-1950fact126 "Lettunich called with that communication instead of writing it because he didn't want a record because that would document violation of law and the Rules of Professional Conduct for lawyers."

127.) Undisputable02-1950fact127 "Anthony Lettunich could have stopped the blockade of the road but chose not to."

23

128.) Undisputable02-1950fact128 "After Lettunich called, Sieverdings did not openly push the road blockade issue because they were afraid of repercussions to their business, their reputations, their children and their social lives."

129.) A Undisputable02-1950fact129. "Around that time (date available), Ed Sieverding, then in 5[th] grade, was attacked in school by three older boys; the leader was the son of a friend of Bennetts. The police did not investigate."

130.) Undisputable02-1950fact130 "During the 10 years the Sieverdings lived on Princeton Ave, the CITY refused to provide a proper road terminus at the end of the road in front of Sieverdings' house as required by CITY ordinances and road standards."

131.) Undisputable02-1950fact131 "CITY public works director James Weber, failed to disclose to the plaintiffs that the City regulated street terminuses and that driveways including Bennetts' are required by local law to have at least a 60 degree angle from the street."

132.) Undisputable02-1950fact132 "The narrow road simply stopped at Bennett's blockade and driveway with no city pavement to turn around on."

133.) Undisputable02-1950fact133 " Because there was no paved turning place, unless the Sieverdings' provided a driveway at their expense located so the public could use it night and day for turning around, vehicles very frequently backed down the road and into the intersection."

134.) Undisputable02-1950fact134 "The vehicles that turned around in Sieverdings' drive or backed into the intersection included cars and trucks driven by city employees and city council members, who frequently went to Bennetts."

24

135.) Undisputable02-1950fact135 "When vehicles used the Sieverding driveway as a turning location, the lights, noise, and intrusion bothered them."

136.) Undisputable02-1950fact136 "Backing down a road is declared in the state driver's handbook to be illegal and dangerous."

137.) Undisputable02-1950fact137 "CITY policy makers deceitfully communicated that backing down the road was neither dangerous nor illegal."

138.) Undisputable02-1950fact138 "The intersection was very near an elementary school and had visibility problems."

139.) Undisputable02-1950fact139 "When the Sieverdings tried not providing a terminus for use by the public, the neighbors blamed the Sieverdings when people backed into the intersection or had difficulty turning around"

140.) Undisputable02-1950fact140 "Melinda Sherman, Daniel Foote, Anthony Lettunich, CITY attorneys, Paul Hughes, CITY manager, Wendy Schulenburg, CITY planning director, James Weber, CITY public works director, Art Fiebing, CITY police chief, J.D. Hays, CITY police department manager, Kevin Bennett, Ken Brenner, Arianthe Stettner, Paul Strong, and James Engleken, CITY council members, and (attorney) Richard Tremaine, the facts concerning the road terminus issue on Princeton Ave."

141.) Undisputable02-1950fact141 "In the United States, police are only supposed to have "nonconsensual contact" when they are investigating a crime."

142.) Undisputable02-1950fact142 "On one occasion, Kevin Bennett got the police to come and stop Tom Sieverding, then 9, from playing between the Sieverdings' property and the street; the officer said Tom should find another place so he wouldn't bother Kevin Bennett."

143.) Undisputable02-1950fact143 "On 4/17/99, Bennett got three cars of police to stop Kay Sieverding and her son from planting flowers next to their drive."

144.) Undisputable02-1950fact144 "The police report described that visit in their report as ongoing conflict Sieverding/ Bennett."

145.) Undisputable02-1950fact145 "In July 2000, the Bennetts were successful in getting the police to go to Sieverdings' home to admonish Kay Sieverding for talking to one of Bennett's employees about the weather, while they were both working outside, and then asking him to move Bennetts' trash and debris off the Sieverding property."

146.) Undisputable02-1950fact146 "The police visits showed neighbors and the Sieverding children that Sieverdings were 2nd class "citizens, and scared the parents, who didn't know what to do but still thought they had enforceable constitutional rights."

147.) Undisputable02-1950fact147 "In May 1999, Kay Sieverding became the only person or company in Steamboat's history required to have a gardening permit to landscape between their private property and the street pavement; the CITY never ever issued another permit to anyone."

148.) Undisputable02-1950fact148 "The CITY had no gardening or trimming permit forms, the permit came as a letter from the CITY manager, Hughes."

149.) Undisputable02-1950fact149 "The gardening permit contained limitations as to the location of allowed gardening limiting it between the Sieverdings' property and the street so that there would be no gardening near Bennett's blockade of the end of Princeton Ave."

26

150.) Undisputable02-1950fact150 "The City land between private property lines and the paved city street in the Sieverdings' former neighborhood averaged 18 feet wide but the city didn't have funds to landscape, kill weeds, mow or trim in these areas."

151.) Undisputable02-1950fact151 "Customary practice was for adjoining landowners to mow, landscape, and trim between their property and the pavement."

152.) Undisputable02-1950fact152 "In April 1999, assistant city attorney, Daniel Foote, wrote deceitful materials justifying the discriminatory regulation."

153.) Undisputable02-1950fact153 "Following the issuing of a letter giving Sieverding permission to garden, the CITY manager, Paul Hughes, on 6/15/99 sent a police officer to deliver criminal charges against Kay Sieverding for minor trimming of a tree by her drive."

154.) Undisputable02-1950fact154 "CITY policy makers were given evidence while the criminal gardening charges were pending that the Bennetts and other people also trimmed trees without permits but were not threatened for it."

155.) Undisputable02-1950fact155 "Kay Sieverding consulted informally with a lawyer she had previously employed…who…told Kay Sieverding that she didn't have any idea what to do."

156.) Undisputable02-1950fact156 "Kay Sieverding thought that public protest might help so she stalled the trial for gardening as long as she could and wrote and distributed thousands of flyers entitled "Arrested for Gardening" asking for help from the public."

157.) Undisputable02-1950fact157 "Sieverding faxed and mailed the "Arrested for Gardening" flyer to every attorney in Steamboat Springs."

158.) Undisputable02-1950fact158 "On 8/3/99 the CITY prosecutor wrote that Kay Sieverding could get 6 months in jail for trimming the tree by her drive."

159.) Undisputable02-1950fact159 "Neither city policy makers nor the forms and paperwork offered a fine payment option for the trimming the branches."

160.) Undisputable02-1950fact160 "Colorado "home rule" law allowed the CITY to potentially try Kay Sieverding in municipal court with a jury of only 3 people and without following procedures that normally protect people accused of crimes."

161.) Undisputable02-1950fact161 "Kay Sieverding was arraigned and a trial was planned for trimming the tree."(hanging over their drive 3/23/05 KS)

162.) Undisputable02-1950fact162 "Because of experiences in David Sieverding's childhood, he was unusually afraid of police and law enforcement."

163.) Undisputable02-1950fact163 "The tree trimming charges were held open until 10/6/99 when the City gave away the end of the street, the Sieverdings gave up access to part of their land and the Sieverdings agreed to sell land to Bennetts for $1."

164.) Undisputable02-1950fact164 "Kay Sieverding "brought information in 1999 about the criminal charges for trimming to the newspaper; reporter Tom Ross told Kay Sieverding in July 2000 that he asked to report it in July 1999 but was told by management not to."

165.) Undisputable02-1950fact165 "The Sieverdings were told by two different attorneys in the employment of the CITY, Collette Erickson and Bridget O'Rourke, that if they didn't agree to a contract with the Bennetts that the tree trimming criminal charges would continue."

28

166.) Undisputable02-1950fact166 "Sieverdings' motivation was to have a normal life for their children in their home and community without controversy."

167.) Undisputable02-1950fact167 "Even if Kay Sieverding wasn't actually convicted of tree trimming, going to Court for unauthorized tree trimming would have been expensive, stressful, and demeaning and also threatened her large investment of time and money in landscaping."

168.) Undisputable02-1950fact168 "Kay Sieverding's goal in August 1999 was to get a road terminus, a "turn-around", for Bennetts to stop parking blocking the street so that Sieverdings could access the Easter portion of their land, an end to hostilities, a portrayal to the local public that they were reasonable people, and an ability to socialize with local people involved with city planning and economic development, subjects she had studied in college and written about."

169.) Undisputable02-1950fact169 "Because she had previously attended conferences on creative problem solving and because a lawsuit seemed too expensive and completely impractical, Kay Sieverding naively thought that mediation would help."

170.) Undisputable02-1950fact170 "Sieverdings had been suggesting mediation with Bennetts for years without success in getting Bennetts to agree."

171.) Undisputable02-1950fact171 "In August 1999, the CITY hired an attorney, Bridget O'Rourke, to mediate between the Bennetts and with the CITY."

172.) Undisputable02-1950fact172 "Sieverdings made a strategic error in not requiring that the criminal charges for branch trimming be dropped before they entered into formal mediation with the Bennetts and the CITY because they trusted that when more CITY policy makers were involved the CITY would act in good faith."

29

173.) Undisputable02-1950fact173 "The City was legally obligated to provide a T

terminus at the end of Princeton Ave."because the city owned land was too steep and not

wide enough to build a cul-de-sac to recognized safety standards (preventing vehicles

from leaving the pavement)."

174.) Undisputable02-1950fact174 "The Sieverdings didn't know in 1999 and 2000 that

that was the CITY'S legal obligation."

175.) Undisputable02-1950fact175 "Relying on her independent traffic observations, Kay

Sieverding proposed the CITY build a T shaped paved terminus."

176.) Undisputable02-1950fact176 "Sieverding had previously made a proposal for at

least a L shaped paved terminus to the CITY in 1994 but, it was refused."

177.) Undisputable02-1950fact177 "To build a safe T terminus at the end of Princeton

Ave."Bennetts would have had to dismantle an old shed near the road."

178.) Undisputable02-1950fact178 "The shed was "nonconforming" because it was only

5 feet from the property line although a 25-foot setback was required from the street

because it predated establishment of zoning and setback requirements in Steamboat

Springs."

179.) Undisputable02-1950fact179 "According to CITY laws, the shed was supposed to

be phased out; it was not registered, and used only for storage."

180.) Undisputable02-1950fact180 "However, Bennetts flat out refused to move their

shed as Sieverdings proposed."

181.) Undisputable02-1950fact181 "Bennett kept the Sieverdings in a weak negotiating

position by directing the CITY not to drop the criminal charges for trimming and not to

enforce or reveal CITY obligations related to a proper (road) terminus and phasing out the non conforming shed."

182.) Undisputable02-1950fact182 "It never occurred to Kay Sieverding at the time that there were applicable laws she didn't know about."

183.) Undisputable02-1950fact183 "James Weber, CITY public works manager, Paul Hughes, CITY manager, Anthony Lettunich, CITY attorney, and Daniel Foote, assistant CITY attorney, knew about the applicable laws but to this date have not admitted their knowledge of the laws."

184.) Undisputable02-1950fact184 "The CITY paid attorney mediator had calls and meetings at the site with Hughes, "Lettunich, Foote and Weber."

185.) Undisputable02-1950fact185 "Bennetts simply refused to have a dedicated road terminus on their side of the street but insisted it double as a drive for horse trailers even though horses were prohibited in the zone. That made it too steep, going down, to function safely as a terminus in snowy conditions for most vehicles." (Steamboat Springs gets an average annual snow fall of 20 feet).

186.) Undisputable02-1950fact186 "The CITY also refused to pave and maintain a terminus on the North side of Princeton, by Sieverdings."

187.) Undisputable02-1950fact187 "The CITY and Bennetts gave Sieverdings an ultimatum to sign contracts allowing the end of the street to be given mostly to Bennetts and no terminus to be built at public expense. They were given a few hours to say yes or no. At that time the criminal charges were still pending and the Sieverdings also risked portrayal to the public as selfish and greedy."

31

188.) Undisputable02-1950fact188 "In 2000 Bennetts got CITY approvals to convert the parking and terminus on the South side to a drive for a new house."

189.) Undisputable02-1950fact189 "At those hearings, Richard Tremaine, Bennetts' attorney, proclaimed that Sieverdinga' driveway was a public facility."

190.) Undisputable02-1950fact190 "The CITY failed to make a tape recording of that meeting as required despite the fact that they had 2 tape recorders."

191.) Undisputable02-1950fact191 "The CITY refused to let Kay Sieverding dispute Tremaine's claim at the meeting that their drive was a public facility."

192.) Undisputable02-1950fact192 "Bennetts failed to disclose their intentions to have the zoning changed to allow them to build a bed and breakfast and horse boarding operation on their property, in the middle of downtown."

193.) Undisputable02-1950fact193 "In July 2001, CITY laws were changed to allow a PUD of any size, anywhere that would offer tourists a unique situation basically defeating the established principles of zoning—equal treatment within zone, regulation only for legitimate public purpose, appropriate mixture of uses and knowable future land use possibilities."

194.) Undisputable02-1950fact194 "Sieverdings received no compensation for giving up access to their property, letting Bennett's have most of the land formerly part of the street, and permanent elimination of the possibility of a CITY financed road terminus that they were not already legally entitled to as citizens and property owners."

195.) Undisputable02-1950fact195 "CITY public works director James Weber, CITY attorney Anthony Lettunich, CITY manager Paul Hughes, assistant CITY attorney Daniel Foote were all involved in developing the contracts but despite spending thousands of

32

dollars and giving away about $100,000 of land, they failed to bring the street any closer to conformance with the CITY'S road standards."

196.) Undisputable02-1950fact196 "The CITY excluded conflicting neighborhood input."

197.) Undisputable02-1950fact197 "In June 2000, Lettunich announced the City had no objection to Bennett converting the south side terminus and Bennett's parking area to another building lot."

198.) Undisputable02-1950fact198 "But the CITY actors acted deceitfully to escape their obligations to provide a road terminus and enforce the parking practices developed by the CITY council and State of Colorado. They used the criminal charges and implicit threat of libel by CITY actors to pressure the Sieverdings to sign a bogus contract for which they received no actual benefit." (extortion by definition)

199.) Undisputable02-1950fact199 "The CITY actors put a clause into the contract insisting that the Sieverdings not publish any materials that criticized Kevin Bennett by name, apparently to facilitate future equal protection violations."

200.) Undisputable02-1950fact200 "As described below, in 2000 when the Sieverdings appealed to the public to help them stop Kevin Bennett's further law breaking by distributing more flyers and in them identified Kevin Bennett as Jane Bennett's husband, Randall Klauzer, Bennett's attorneys, improperly used the Courts to stop Sieverdings from petitioning government, deceitfully categorizing distributing flyers and an oral claim of constitutional rights as "molestation, harassment, and violence"."

201.) Undisputable02-1950fact201 "After David Sieverding wrote to the police on 9/11/00 with details why he thought the land for pardon deal was criminal extortion,

district attorneys Kerry "St. James, deceitfully told J.D. Hays (police office) that it was "a civil matter"."

202.) Undisputable02-1950fact202 "After receiving the $1 land from Sieverdings, plus additional land free from the CITY, starting in June 2000 and working until at least May 2001, the Bennetts built two new buildings, one with heating and plumbing, and turned the "non-conforming" shed into a small house."

203.) Undisputable02-1950fact203 "Bennetts' property was zoned only for a single family house or duplex plus a small "accessory building" for use only by residents of the main house but the Bennetts ended up with three detached buildings with heating and plumbing physically useable as dwellings and about 5 times as much "accessory building" space as allowed by law at the time."

204.) Undisputable02-1950fact204 "These buildings were close to the Sieverdings' property; although a 25-foot front setback was required by law, the "guest house" was only 5 feet back and the 2 story 2000 foot heated and plumbed "garage" was 10 feet away."

205. ) Undisputable02-1950fact205 "The Sieverdings expected that Bennett's son, Ed Ryberg, who had harassed them in 1995 when he was 15, who had reportedly been arrested for drug possession, and who had taunted Kay Sieverding outside a movie theater in 1999 …would occupy one of the units near their property without the control of on site parental supervision."

206.) Undisputable02-1950fact206 "The Bennetts, their lawyers Richard Tremaine and Randall Klauzer, and various city officials deceitfully claimed that one building Bennett's built in 2000-2001 was a "garage" although it was over 2000 square feet, was two stories

34

with many picture windows on the second floor, was heated, had a bathroom with a shower, had several rooms, and reportedly had connections for a stove."

207.) Undisputable02-1950fact207 "City law requires all driveways to have at least a 60-degree angle from the street, which allows a vehicle to turn out in either direction, but the Bennetts were allowed to convert the end of the street to a drive with no angle or turning provisions."

208.) Undisputable02-1950fact208 "In September 2000, the Bennetts made their "driveway" longer by simply ripping out and repaving more street and by parking in front of Sieverdings' street front as if their driveway was 5 feet longer--simply ignoring the property line."

209.) Undisputable02-1950fact209 "In June 2000, Kay Sieverding discovered the Bennett's construction plans before construction was barely started "and complained to the Bennetts, their attorneys, and CITY policy makers that the Bennetts planned build beyond what was legal."

210.) Undisputable02-1950fact210 "On 7/13/00, before Bennett's planned construction was far along, the City planning services director, Wendie Schulenburg, wrote Kay Sieverding a deceitful letter claiming that Bennett's planned construction was legal."

211.) Undisputable02-1950fact211 "Kay Sieverding wrote back to Schulenburg and CITY policy makers disputing Schulenburg's deceitful claims that 2nd floor space was a garage and that the shed was not altered or improved when it was converted to a house."

212.) Undisputable02-1950fact212 "From July 2000 to the present, CITY policy makers have refused to acknowledge Sieverdings' factual evidence showing that Bennetts'

35



construction was in very substantial violation of the local laws designed to protect the neighbors."

213.) Undisputable02-1950fact213 "After lying about it, the City and its employees refused to enforce its zoning and development laws on the Bennett's land even though they were energetically enforced on other property owners."

214.) Undisputable02-1950fact214 "In August 2000 Paul Hughes, Kevin Bennett, Wendie Schulenburg, Art Fiebing, J.D. Hays, Arianthe Stettner, James Engleken, Ken Brenner, Paul Strong, Anthony Lettunich, James Weber, and Daniel Foote knew that the code enforcement officer, Sandy Fiebing, wasn't keeping a log of inspections at Bennetts' or responding to the Sieverdings' complaints as was required because Kay Sieverding told them, bringing them incontrovertible evidence."

215.) Undisputable02-1950fact215 "Because of its small population, Steamboat Springs doesn't have many law firms."

216.) Undisputable02-1950fact216 "The Sieverdings had tried to get a lawyer in Steamboat to stop Bennetts from violating City laws but couldn't."

217.) Undisputable02-1950fact217 "Their long time family lawyer, Tom Sharp, had said he would lose the water and sewer account if he helped."

218.) Undisputable02-1950fact218 "The Sieverdings were advised by many people that no lawyer in Steamboat would be fully honest regarding the CITY."

219.) Undisputable02-1950fact219 "The Sieverdings applied for injunctive relief in Routt County district court to have the CITY zoning and development laws enforced at the Bennetts and a hearing was held on 7/27/00."

36

220.) Undisputable02-1950fact220 "On 7/25/00, Kay Sieverding brought the summons, quoting the violated laws in detail, to Klauzer & Tremaine, LL(P)."

221.) Undisputable02-1950fact221 "Bennett's attorneys, Richard Tremaine and James "Sandy" Horner, submitted a motion to dismiss dated 7/27/00, which included deceitful statements, misquoted an irrelevant case, and was designed to intimidate the plaintiffs, and allow the construction to proceed in violation of the local laws."

222.) Undisputable02-1950fact222 "James "Sandy" Horner stopped the Sieverdings' request for injunctive relief by refusing to let the Sieverdings use his properly certified copy of the City laws and requesting that City planning services director Wendie Schulenburg not testify about the content of the City statutes. (The City sold the Sieverdings an "improperly certified" copy of the laws)."

223.) Undisputable02-1950fact223 "Many of the defendants located in Steamboat Springs CO had personal animus towards the plaintiffs or wanted them gone because the adult plaintiffs had the potential to be 'whistle blowers' and there were government actions and non actions and improper or illegal activities taken or planned by defendants and their associates."

224.) Undisputable02-1950fact224 "Preceding these events, City policy makers gave a big and controversial variance to setback ordinances, against written law, to a $150 million hotel (The Grand Summit)."

225.) Undisputable02-1950fact225 "Another variance went to…,a city planner employed by the CITY, who was "caught" by her neighbor."

226.) Undisputable02-1950fact226 "In July 2000 Kay Sieverding developed a flyer called 'City of Steamboat is Corrupt and Dishonest' (see exhibit)"

227.) Undisputable02-1950fact227 "In July and August 2000, Sieverdings distributed about 5000 of the 'City of Steamboat is Corrupt and Dishonest' flyers. They emailed them to every listing on the Steamboat Springs Chamber web sites, faxed them to every law firm in Steamboat, and distributed them on the windshields at city hall, the courthouse, the industrial park, and the golf course. They distributed them to most local businesses and in the neighborhoods, at school offices, public gatherings and at city council meetings. Kay Sieverding delivered copies to every room in the County building including the district attorneys' and county attorneys' offices. She put them on every bulletin board she could find and taped them to doors."

228.) Undisputable02-1950fact228 "A local liquor store, whose owner had been hurt by the CITY, made photocopies and put them on the counter for months."

229.) Undisputable02-1950fact229 "Sieverding emailed 'City of Steamboat is Corrupt and Dishonest' to every 100 lawyers listed on the web site at Davis, Graham & Stubbs because she had been told they represented the CITY and thought they would stop the illegal construction."

230.) Undisputable02-1950fact230 "A former partner of Davis, Graham & Stubbs was president of the CBA; they were advertising their influence with the CBA."

231.) Undisputable02-1950fact231 "Any lawyer seeing the flyer would know that attorney misconduct was involved." (see exhibit)

232.) Undisputable02-1950fact232 "No one at Davis, Graham & Stubbs reported Kay Sieverding's allegations to the 'appropriate authorities' even though reporting is required by the Colorado Rules of Professional Conduct and even though she reported violations of law."

38

233.) Undisputable02-1950fact233 "On 8/29/00, Kay Sieverding told Jane Bennett that just because she was married to the president of the city council she wasn't entitled to break the law and she accused Kevin Bennett of violating the U.S. Constitution and City laws."

234.) Undisputable02-1950fact234 "Her son Ed Sieverding was with her and Kevin Bennett then told him that his mother was mentally ill."

235.) Undisputable02-1950fact235 "At the time of this conversation, Kay and Ed Sieverding were standing on paved street in front of their home, Jane Bennett was in her car parked about 30 feet from the street and then went inside, and Kevin Bennett and two construction workers were on the second floor of the building they were building about 30 feet from the street and the Sieverdings."

236.) Undisputable02-1950fact236 "Comparing reports of Jane Bennett and her carpenters, about 45 words were said in total by everyone there."

237.) Undisputable02-1950fact237 "The conversations did not include obscenities and the only threat was of legal action."

238.) Undisputable02-1950fact238 "On 9/2/00, Kay Sieverding was criminally charged on a CITY police summons and complaint form by Jane Bennett with stalking of Jane Bennett defined as repeated following about a public place and referring to the ultimate sexual act."

239.) Undisputable02-1950fact239 "No police officer asked Kay Sieverding, Ed Sieverding, Kevin Bennett or uninvolved neighbors about 8/29/00 or whether there were incidents of harassment on any other occasion."

240.) Undisputable02-1950fact240 "Only Jane Bennett signed the complaint delivered by police to Kay Sieverding as "arresting officer"."

241.) Undisputable02-1950fact241 "Someone later altered the record and added an officer's initials and badge number."

242.) Undisputable02-1950fact242 "CITY police and policy makers refuse to say how or when the police record was altered."

243.) Undisputable02-1950fact243 "No police officer made a record as to what the probable cause was to charge Kay Sieverding with harassment. The records referred only to police reports by Jane Bennett and her employees, none of which supported a criminal charge."

244.) Undisputable02-1950fact244. "Art Fiebing, CITY assistant chief of police, knew that Kay Sieverding and other witnesses on 8/29/00 identified by Jane Bennett were never interviewed by police, in violation of Colorado law, which requires that harassment be investigated."

245.) Undisputable02-1950fact245. "Sieverdings were home every day but were never contacted by police for an interview."

246.) Undisputable02-1950fact246 "Because police only interviewed Jane Bennett and her employees, there could be no contradictory evidence."

247.) Undisputable02-1950fact247 "The police officers, Timmons and Brown, seemed embarrassed when they brought the summons and left quickly."

248.) Undisputable02-1950fact248 "All the prosecutors, the police management, Bennett's lawyers, the CITY council, the county judge, the city staff listed previously and virtually all local attorneys knew that Kevin and Jane Bennett had financial motivation

for abuse of process—to stop the Sieverdings from complaining about their violations of

the zoning and development laws and stop them from distributing the "City of Steamboat

is Corrupt and Dishonest" flyers."

249.) Undisputable02-1950fact249 "On 9/5/00, attorneys Lettunich and Foote were

believed to be present when Kevin Bennett called the bailiff to throw David Sieverding

out of a CITY council meeting when he tried to give a speech about the 'rule of law

versus rule of man'."

250.) Undisputable02-1950fact250 "With only 3 working days notice at the request of

Klauzer, Kay Sieverding was ordered to County Judge Garrecht's court on 9/6/00 for a

domestic abuse restraining order to keep her 30 feet from Jane Bennett."

251.) Undisputable02-1950fact251 "Because Routt County is so small, Bennetts and

Klauzer knew in advance that James Garrecht would be the judge."

252.) Undisputable02-1950fact252 "In Colorado, domestic abuse restraining order

actions are low process hearings with no jury, no opportunity to review evidence before

the hearing, no list of witnesses provided, and no application of the Code of Criminal

Procedure."

253.) Undisputable02-1950fact253 "Judge Garrecht was told Kay Sieverding tried

unsuccessfully to get a lawyer."

254.) Undisputable02-1950fact254 "Judge Garrecht did not offer Kay Sieverding a

continuance to get a lawyer as is required by due process."

255.) Undisputable02-1950fact255 "Even if the restraining order were refused, the

experience and publicity of the hearing would have hurt Sieverdings."

41

256.) Undisputable02-1950fact256 "The newspaper sent a reporter and covered the hearing in great detail."

257.) Undisputable02-1950fact257 "Kay Sieverding tried to prove that Jane Bennett had financial motivation for abuse of process but Judge Garrecht and Randall Klauzer would not allow her to discuss, ask questions about, or show the zoning and development laws."

258.) Undisputable02-1950fact258 "The Judge, did, however, allow Wendie Schulenburg, (AKA Wendie Roonie) CITY planning services director, to repeatedly and knowingly perjured herself on 9/6/00 saying that the Bennett's construction was legal."

259.) Undisputable02-1950fact259 "The newspaper published Schulenburg's deceitful statements although they knew they were false."

260.) Undisputable02-1950fact260 "Schulenburg made these statements in direct response to questions from Randall Klauzer."

261.) Undisputable02-1950fact261 "Attorney Randall Klauzer knew before he asked Schulenburg (AKA Roonie) the questions about Bennetts' code compliance that if Schulenburg told the truth it would hurt his client Jane Bennett by proving her ulterior motives."

262.) Undisputable02-1950fact262 "Randall Klauzer knew as soon as he heard Schulenburg's testimony that it was perjury."

263.) Undisputable02-1950fact263 "Jane Bennett said in Court that she was upset about the flyers Sieverding "was distributing against us"."

264.) Undisputable02-1950fact264 "Judge Garrecht said that he had seen the flyers."

265.) Undisputable02-1950fact265 "On 9/6/00, Judge Garrecht said "before the court can issue the restraining order, the Court needs to find that the defendant has attacked, beaten,

molested, or threatened the life of the plaintiff or threatened to do serious bodily injury to the plaintiff, and that unless restrained and enjoined will continue to attack, beat, molest, or threaten the life of the plaintiff or threaten to do serious bodily harm to the plaintiff...obviously, Ms. Bennett has not been attacked, beaten, and her life hasn't been threatened."

266.) Undisputable02-1950fact266 "However, after Klauzer told the judge to 'stop cutting bait, it's time to fish', the Judge issued an order that Kay Sieverding must keep 30 feet from Jane Bennett at all times except in court even in her own yard or be thrown in jail."

267.) Undisputable02-1950fact267 "Ed Sieverding, then 14, was in court and heard his mother libeled by Judge Garrecht, Klauzer, and Jane Bennett."

268.) Undisputable02-1950fact268 "The Judge said "You're facing...the maximum of up to six months....think that's what's going to happen" (said in civil hearing 9/6/00)

269.) Undisputable02-1950fact269 "If the bogus criminal charges had gone to trial, Garrecht would have been the judge."

270.) Undisputable02-1950fact270 "Because of a 1984 U.S. Supreme Court decision, all judges are immune from suit for hurting people in court even if they take a bribe, lie, ignore perjury, violate due process, make decisions without authority, misquote laws, or make findings that have no relationship to the evidence presented"

271.) Undisputable02-1950fact271 "The Supreme Court decision giving judges total immunity happened around the same time that the ABA, CBA, and Colorado Courts changed lawyers 'Rules of Professional Conduct' to offer less protection to the public from deceitful attorneys."

43

272.) Undisputable02-1950fact272 "Kay Sieverding didn't know about the 1984 Supreme Court Decision because the course she took in constitutional law while studying city planning was in 1976, preceding the decision. Since she was not a lawyer, she hadn't followed legal developments."

273.) Undisputable02-1950fact273 "In 2002, the ABA president said it is common for judges to take bribes, especiallynear an election like County Judge Garrecht faced."

274.) Undisputable02-1950fact274 "In Court on 9/6/00, Randall Klauzer libeled Kay Sieverding saying, "aggression, hysteria... threat towards Ms. Bennett (p6 line15)... "attack, insult, injury, damage from Ms. Sieverding (Kay Sieverding)" (p6 line 20-21)..."dramatic increase in the level of threat and violence that has occurred" (p7 line 4-5)... "for want of a better word—violence of her behavior" (p 41 lines 20-21). "Increasing in violence" (p76, line 11) "will she stop following you (Jane Bennett)?" (P87, lines 14) "will she injure you (Jane Bennett) ..." (p 88, line7)... "this is a mania, and I mean mania...the fact that it is a mania" (p97, lines 23-24)... "The fact of the matter is that the molestation (of Jane Bennett) is, as the evidence, quite frankly, is unrefuted, is expanding, increasing, becoming more violent, becoming more involved" (p 161, lines 20-22) "she (Kay Sieverding) has a mania...she was mania in the plural" (p."162, lines 13-14)... "continue to abuse" (p 163)."

275.) Undisputable02-1950fact275 "Randall Klauzer had no legitimate motivation or reason to make the preceding statements."

276.) Undisputable02-1950fact276 "Neither Jane Bennett nor her witnesses nor the two police officers testified on 9/6/00 that there was any violence, any sexual or physical contact at all, any threat of violence, any obscenities as legally defined, any threatening

44

or obscene hand gestures, any brandishing weapons, any amplified sound, any conversation over a few sentences said on the date in question, any witness of Kay Sieverding on the Bennett's property, any witness of Kay Sieverding in any proximity of Jane Bennett, any record of Kay Sieverding being off the paved public street near either Kevin or Jane Bennett, any police calls concerning possible harassment of Jane Bennett other than 8/29/00 or any recent, physically threatening or abusive conversation between Kay Sieverding and Jane Bennett."

277.) Undisputable02-1950fact277 "On 9/6/00, Klauzer wasn't a witness. He wasn't sworn to tell the truth nor subject to cross examination."

278.) Undisputable02-1950fact278 "Apparently, many lawyers believe that witness immunity extends to statements made by lawyers in court but no higher court has ever ruled that, nor has the State conferred immunity on lawyers, except for state employed prosecutor acting with good will in the scope of their official prosecutorial function with defendants who are protected by the Rules of Criminal Procedure."

279.) Undisputable02-1950fact279 "On three occasions, the CITY police refused to take a report on Kay Sieverding's complaints related to the crimes described herein and J.D. HAYS in June 2001 ordered Kay Sieverding to take her evidence and "get out of the police station"."

280.) Undisputable02-1950fact280 "In September 2000, former City police officer …was apparently demoted and/or fired for aiding the plaintiffs."

281.) Undisputable02-1950fact281 "The apparent demotion of (the former police officer) indicated to other police not to help the Sieverdings."

45

282.) Undisputable02-1950fact282 "Unfortunately for Kirby, Kay Sieverding wrote the district attorneys' office and put in her response to the action before the hearing that Kirby had warned her that the district attorneys' office was "in on it" because "Kevin Bennett had all the power"."

283.) Undisputable02-1950fact283 "Jane Bennett knows and knew that she was in no danger of violence or molestation from Kay Sieverding at any time."

284.) Undisputable02-1950fact284 "Until they moved 10 months later, Kay Sieverding had to watch for her next-door neighbor Jane Bennett any time she went outside the house." If she wanted to go to public functions… she had to check whether Jane Bennett was on the guest list before she bought tickets." She cashed in her ski pass because she was afraid Jane Bennett would corner her skiing." Although she was interested in city planning, she was afraid to attend meetings and conferences where Bennett might be."

285.) Undisputable02-1950fact285 "After the restraining order was issued, Jane Bennett frequently parked in front of Sieverding's home instead of in her drive and apparently followed her around town trying to frame her."

286.) Undisputable02-1950fact286 "The police were more aggressive in enforcing the restraining order against Kay Sieverding then they would be normally."

287.) Undisputable02-1950fact287 "The police called David Sieverding and tried unsuccessfully to get him to say that his wife had stepped on Bennett's property so they could arrest her."

288.) Undisputable02-1950fact288 "A domestic restraining order makes legal behavior such as going to the store, illegal. If the police could claim that Kay Sieverding came within 30 feet of Jane Bennett, or made eye contact with her, she could be arrested. If so,

46

she would have been prosecuted by Bennett's district attorney friends in Judge Garrecht's court."

289.) Undisputable02-1950fact289 "On October 27, 2000, Jane Bennett wrote to the local district attorney's office and asked them to continue to pursue criminal charges on Kay Sieverding knowingly libeling Sieverding saying "she may turn up and push herself on me... My husband and (I) have been harassed repeatedly over the last eight years... and more aggressively over the past two years... Ms. Sieverding (Kay Sieverding) has circulated illegally, numerous flyers... She has written many emails and letters defaming me and my husband's name and harassing other individuals demanding that they take action against us when we have done nothing wrong... verbally screaming at my workers... Screamed at the phone company employees... our friends and workers are not comfortable to come to our home for fear of harassment from Ms. Sieverding... she harassed (our guests) even though they are parked legally... she has taken photographs of me... was waiting for me as I came out the door... When I was making copies of photographs at Wal-Mart, she hovered near me (within 2 feet)... Ms. Sieverding's malicious behavior"

290.) Undisputable02-1950fact290 "There was no evidence anywhere to support any of these defamatory statements."

291.) Undisputable02-1950fact291 "On another occasion, Jane Bennett complained to the police and district attorney that Kay Sieverding was doing something improper when she waited, without knowing Jane Bennett was watching her, at the street corner for the light to change. Fortunately the light changed and Kay Sieverding crossed the street before the police got there." (date available)

47

292.) Undisputable02-1950fact292 "Steamboat is small geographically and the Sieverdings lived adjoining Benenetts so it was hard to avoid Jane Bennettt."

293.) Undisputable02-1950fact293 "The police told Kay Sieverding that even going to her car in her driveway she was proceeding at her own risk if Jane Bennett should suddenly appear. She (Kay Sieverding) had to get a police escort so she could go to her car without fear of jail and pick up Tom, because Jane Bennett was parked by her drive.' (date and police tape recording available)

294.) Undisputable02-1950fact294 "At the request of Kevin Bennett and/or Jane Bennett, the police repeatedly followed Kay Sieverding around Steamboat Springs, followed her to the newspaper office, repeatedly interviewed bystanders in stores as to whether they had seen Kay Sieverding near Jane Bennett, and interviewed bystanders at public events as to whether they had seen Kay walking near her."

295.) Undisputable02-1950fact295 "After a bogus criminal complaint by Kevin Bennett, the police went to the high school on 3/31/00 to interview Ed Sieverding about whether his mother was at Bennetts' thereby causing Ed embarrassment and emotional distress."

296.) Undisputable02-1950fact296 "At the request of Jane and/or Kevin Bennett, police came to Sieverding's home without a warrant early on Sunday 12/13/00. When Dave Sieverding let them come inside they refused to leave for half an hour, although the Sieverdings were in their pajamas and Kay Sieverding called police dispatch to complain and ask for an explanation. They didn't even offer Miranda rights."

297.) Undisputable02-1950fact297 "Jane Bennett followed Kay Sieverding through the 2001, 4th of July parade yelling, "stay away from me"."

298.) Undisputable02-1950fact298 "The restraining order continues in force today (through 08/19/05) although Kay Sieverding requested twice to Judge James Garrecht (7/14/01, 9/21/01) that it be voided."

299.) Undisputable02-1950fact299 "As part of her applications to have the restraining order voided, Kay Sieverding supplied Judge attorney James Garrecht a letter from a psychologist saying she was "normal", a copy of Wendie Schulenburg's perjury, proof that that was perjury, and with an explanation of her motive for speaking to Jane Bennett, Jane Bennett's motive for the abuse of process, and with quotes from sworn testimony by Jane Bennett and her employees proving that there was no harassment, no stalking, and no obscenities."

300.) Undisputable02-1950fact300 "At Judge Garrecht's direction, Kay Sieverding sent Jane Bennett a copy of her analysis of Wendie Schulenburg's perjury and the quotes from her (Jane Bennett's) testimony which proved that Sieverding had never harassed her."

301.) Undisputable02-1950fact301 "Randall Klauzer and Jane Bennett wrote deceitful responses to the Court dated 7/25/01 and 9/21/01 implying that the restraining order was properly issued and that Kay Sieverding had done something illegal."

302.) Undisputable02-1950fact302 "Wittemyer was the district attorney assigned to handling the criminal charges placed on Kay Sieverding by Jane Bennett."

303.) Undisputable02-1950fact303 "Wittemyer's husband is a real estate sales agent handling a planned ski area and resort—a potential $300,000 commission."

304.) Undisputable02-1950fact304 "The ski area listed by Mr. Wittemyer would need cooperation by local government policy makers to get permits."

305.) Undisputable02-1950fact305 "Resort property development, sale, and rental is the major none government source of income in the area."

49

306.) Undisputable02-1950fact306 "The case could have been reassigned due to conflict of interest but it wasn't." (Sieverdings didn't know about Mr. Wittemyer)

307.) Undisputable02-1950fact307 "For almost 7 months, Wittemyer held open the criminal harassment charges on Kay Sieverding."

308.) Undisputable02-1950fact308 "Wittemeyer had reason to know that Bennett's motive was to cover up their law breaking because Sieverding had brought the "City of Steamboat is Corrupt and Dishonest" to her office and her husband's office, as well as other information to the DA's office."

309.) Undisputable02-1950fact309 "Because her husband was involved with complicated real estate sales, she knew more about zoning and land use laws."

310.) Undisputable02-1950fact310 "P.Elizabeth Wittemeyer refused to give Kay Sieverding a statement of probable cause."

311.) Undisputable02-1950fact311 "P.Elizabeth Wittemeyer lied in a letter saying she gave a probable cause statement to Judge Garrecht."

312.) Undisputable02-1950fact312 "Wittemeyer knew there was no probable cause to charge Kay Sieverding with harassment."

313.) Undisputable02-1950fact313 "On 3/27/00, Wittemeyer wrote deceitfully on a motion to dismiss "Although probable cause exists, it would not be in the best social or economic interests of the public to persist in the prosecution of this case. The victim concurs in this decision." This was deceitful because there was no probable cause and no victim."

314.) Undisputable02-1950fact314 "As printed on 3-31-01, Wittemeyer libeled Kay Sieverding by telling the newspaper there was probable cause to prosecute her for harassment. She implied Kay Sieverding was a criminal."

315.) Undisputable02-1950fact315 "On 3/31/01, the newspaper, The Steamboat Today, printed Wittemeyer's libel that there was probable cause to believe that Kay Sieverding criminally harassed Jane Bennett without verifying that there was even though Kay Sieverding told the reporter that she didn't know what it was. They apparently didn't ask how the conversation could possibly be construed as a crime."

316.) Undisputable02-1950fact316 "The Steamboat Today and Pilot newspapers repeatedly printed statements such as "The city's planning department has responded to Sieverding's claim and notified her that the Bennett's construction is in compliance with the city's code" (1/26/01)."

317.) Undisputable02-1950fact317 "Kay Sieverding had repeatedly given them detailed and incontrovertible evidence that it was a lie and personally requested to the publisher, Suzanne Schlicht and reporters that they investigate."

318.) Undisputable02-1950fact318 "Reporter Tom Ross told Kay Sieverding that CITY manager Paul Hughes would never admit the truth."

319.) Undisputable02-1950fact319 "The CITY government, the real estate industry, and the employer of Mr. Wittemeyer are the newspaper's major advertisers."

320.) Undisputable02-1950fact320 "The newspaper fixed its email to reject emails from Sieverding."

321.) Undisputable02-1950fact321 "Despite Sieverding's repeated requests, CITY council members refused to investigate or discuss the matters."

51

322.) Undisputable02-1950fact322 "In January 2002, J.D. Hays, with the knowledge of City policy makers, refused to investigate why police records concerning criminal charges against Kay Sieverding were altered." (letters available)

323.) Undisputable02-1950fact323 "On 7/11/01 and on 12/21/01 Kay Sieverding wrote to district attorneys Lance and McLimans and requested that they investigate Schulenburg's perjury (a felony) and included incontestable detailed proof of the perjury but they didn't respond to her."

324.) Undisputable02-1950fact324 "On 2/1/2002, Charles Lance sent Kay Sieverding a deceitful fax with false statements of law claiming that if she called Kevin Bennett an "asshole", as alleged, that that would constitute harassment of Jane Bennett."

325.) Undisputable02-1950fact325 "This was shortly after President Bush called a reporter an "asshole" on national television."

326.) Undisputable02-1950fact326 "From July 2000 to March 2002, the Sieverdings repeatedly contacted the CITY policy makers and requested, offering to pay, that someone working for the CITY compare Bennett's construction as shown in the building plans filed with the joint CITY –county building department and the CITY ordinances in effect during the construction."(including 6/26/00, 7/17/00, 7/22/00, 7/25/00, 7/26/00, 8/3/00, 8/9/00, 8/11/00,9/12/00, 2/13/01, 5/1/01, 7/24/01, 10/10/01, 11/14/01, 12/1/01, 12/11/01, 1/4/02)

327.) Undisputable02-1950fact327 "By their refusal to compare the buildings to the laws, an estimated task of 47 minutes, the CITY council made allowing Bennetts to build in violation of the laws policy not negligence."

328.) Undisputable02-1950fact328 "Kay Sieverding told the city policy makers that it was very important to do this research so that she could prove her innocence and because Ed Sieverding was too stressed out to go to school."

329.) Undisputable02-1950fact329 "In September 2002, Steamboat planner Tim McHarg indicated to Kay Sieverding that he might do the research she needed."

330.) Undisputable02-1950fact330 "Sieverding sent McHarg a check for his time and called him to follow-up, but Tim McHarg told Kay Sieverding that he checked with CITY attorney Anthony Lettunich and CITY manager Paul Hughes who told him not to compare Bennett's buildings (and) the laws."

331.) Undisputable02-1950fact331 "It would have been harder for McHarg to lie than for Schulenburg and Tracey Hughes because McHarg alone was certified and subject to regulation and investigation by the American Institute of Certified Planners."

332.) Undisputable02-1950fact332 "The AICP has stronger industry self-regulation than the legal industry because the AICP has a policy of investigation of complaints and will allow the complaining party to be involved with the investigation."

333.) Undisputable02-1950fact333 "Unfortunately, the AICP does not investigate non-members such as Schulenburg."

334.) Undisputable02-1950fact334 "On 11/26/01, Paul Hughes wrote that he refused to have the research done saying Bennett's construction "conforms to all regulations in effect at the time of permitting" and he sent a copy of his letter to almost all the CITY policy makers."

335.) Undisputable02-1950fact335 "Hughes sent his 11/26/01 letter to the Council and Lettunich making the refusal to investigate policy not negligence."

336.) Undisputable02-1950fact336 "Money for investigation was not a reason because Sieverding had sent them $450 to do so."

337.) Undisputable02-1950fact337 "…County Judge James Garrecht, Anthony Lettunich, Richard Tremaine, James B.F. Oliphant, Randall Klauzer, … P. Elizabeth Wittemeyer, James "Sandy" Horner, Daniel Foote, Melinda Sherman, Bridget O'Rourke, Collette Erickson, Judge Paul Sachs, Judge Richard Doucette, Kerry St. James, former Colorado Judge Joel Thompson, Tom Sharp, John A. Vanderbloemen, David Moffat, and most other attorneys in the Steamboat were aware of violations in the Colorado Rules of Professional Conduct and crimes affecting the Sieverdings."

338.) Undisputable02-1950fact338 "Kevin Bennett trespassed on Sieverdings' posted property on 4/1/01, taunting Ed Sieverding."

339.) Undisputable02-1950fact339 "In July 2000, a lawyer from Boulder familiar with Steamboat policy makers had advised the Sieverdings that their only option was to move away but the Sieverdings had rejected that advise."

340.) Undisputable02-1950fact340 "Sieverdings resisted the moving option as long as they could thinking that the situation would be investigated and remedied."

341.) Undisputable02-1950fact341 "In April 2001, they listed their home for sale and moved into temporary quarters while they packed and repainted."

342.) Undisputable02-1950fact342 "It sounds stupid, but the Sieverdings really wanted to stay because it was their long term home, they had friends there, they liked the small resort city life style, the area and weather were absolutely beautiful, their garden was their main hobby, and their land was beautiful. Kay Sieverding still has vivid dreams about her garden in Steamboat. Ed Sieverding still wants to go back."

54

343.) Undisputable02-1950fact343 "Before moving, the Sieverdings told the newspaper and the City Council that they would move because of these events."

344.) Undisputable02-1950fact344 "The Sieverdings told the City Council they had no other reason to move and didn't want to."

345.) Undisputable02-1950fact345 "To get the money to move, the Sieverdings announced they would subdivide their yard to get an additional building lot, which would benefit from a drive located near Bennetts."

346.) Undisputable02-1950fact346 "The plan they developed to get the highest price was to make the lot "L-shaped" and sell it as a lot for a duplex with two drives, one off each street. That was in accordance with the zoning, which Kay Sieverding looked up."

347.) Undisputable02-1950fact347 "To do the minor subdivision months of CITY paperwork and meetings were required."

348.) Undisputable02-1950fact348 "Weber wrote 1/29/01 by email 'public works…have authority over the number, size, and location.' (of driveways)"

349.) Undisputable02-1950fact348 "Kay Sieverding found the claim in an email addressed to planning in the city-planning file about their property."

350.) Undisputable02-1950fact350 "Webers' email was deceitful because there was no procedure or checklist or form for applying for a residential driveway location permit and the official guidelines for residential zones, other than the 60-degree rule and a minimum size, only discussed draining. Another neighbor paved their entire front lawn."

351.) Undisputable02-1950fact351 "The Bennetts made it clear that they didn't want there to be another drive near their property."

352.) Undisputable02-1950fact352 "To make the L-shaped lot seem viable to potential buyers, in the fall of 2000, they Sieverdings removed expensive landscaping, recently installed, and formed a rough drive into their lot near Bennett's drive and put a sign there saying 'private drive'."

353.) Undisputable02-1950fact353 "The Bennetts responded by regularly parking in front of the drive.".

354.) Undisputable02-1950fact354 "Police officer .... told Kay Sieverding that Chief of Police Art Fiebing told the police not to enforce the CO traffic law that prohibited parking within 5 feet of a drive on their street."

355.) Undisputable02-1950fact355 "On 3/20/01, CITY attorney Lettunich and planning had a meeting about the Sieverdings' property but the Sieverdings weren't allowed to attend although she had requested. Such meetings were not a part of Lettunich's normal CITY attorney function."

356.) Undisputable02-1950fact356 "Sieverdings' minor subdivision actions were scheduled for public review in April and the meeting was apparently to develop a plan to stop or limit the subdivision even though it complied with the laws and was a use by right."

357.) Undisputable02-1950fact357 "Before the meeting, a threat was relayed to Sieverding through their surveyor that the planning commission would only approve the subdivision request if the Sieverdings agree to 'lay off' Bennetts."

358.) Undisputable02-1950fact358 "Kay Sieverding documented the illegal threat to the CITY Attorney Lettunich."

359.) Undisputable02-1950fact359 "The surveyor, Brian Kelly, told the Sieverdings he would use his professional status to expose the allowed violations of the zoning and development code, and called the newspaper reporter Tom Ross and said so. Suddenly, however, he refused to return calls from both Kay Sieverding and Tom Ross."

360.) Undisputable02-1950fact360 "Kay Sieverding brought a copy of the Supreme Court decision The Village of Willowbrook v.Olech and proof showing that all similar requests had been approved to the hearing. She said she would sue them personally if they refused it, so they approved it."

361.) Undisputable02-1950fact361 "At the hearings there was extensive discussion as to whether the Sieverdings' lot could have two driveways, because Bennetts had requested that the deed be restricted to allow only one driveway. Kay Sieverding gave a PowerPoint presentation to show why there was no legitimate public purpose to restricting the Sieverdings' lot to one drive and again threatened to sue, so it was passed without driveway restrictions. The professional planners said they were not requesting driveway restrictions. There was no precedent."

362.) Undisputable02-1950fact362 "In July of 2001, the CITY passed a law saying that properties like the Sieverdings could only have one driveway."

363.) Undisputable02-1950fact363 "There is no precedence in or out of Steamboat Springs for allowing only one driveway."

364.) Undisputable02-1950fact364 "The CITY also passed a law saying that houses could only be rented to three unrelated people, knowing that the Sieverdings' home had 6 bedrooms, with the apparent motive to stop the Sieverdings from being able to rent their

home at market rates so that they couldn't rent it and wait while they tried to resolve the legal situation."

365.) Undisputable02-1950fact365 "However, there was no publicity about this new law and the local newspaper regularly carries advertisements for roommates to share homes with 3 or more roommates so given the small town nature, it seems they only planned to enforce it on the plaintiffs. The plaintiffs' real estate agent owned rental houses and said she never heard about it."

366.) Undisputable02-1950fact366 "With no option to live in their home or rent it at market rates, and with their finances depleted by these events, the Sieverdings were forced to sell both their home and lot for less than full value. Bennett's former attorney, James B.F. Oliphant, who had written the deceitful letter in 1992 and encouraged Bennett to continue to illegally blockade the road, bought the Sieverdings' home for $100,000 less than he knew it was appraised for."

367.) Undisputable02-1950fact367 "Oliphant knew that Bennetts had violated the zoning and development laws and that Kay Sieverding was under a restraining order, but refused to assist the Sieverdings despite their requests."

368.) Undisputable02-1950fact368 "The lot was purchased for less than full value by the father of the former assistant city attorney, Melinda Sherman."

369.) Undisputable02-1950fact369 "The Sieverdings had buyers for their lot at $75,000 more, who refused after the second driveway was disallowed."

370.) Undisputable02-1950fact370 "Because the L shaped lot was narrow, it will not work as a duplex without two drives. Duplexes are popular in resorts."

371.) Undisputable02-1950fact371 "While they researched the law related to these events, Sieverdings filed draft lawsuits, replaced by this one, without properly servicing the defendants." On or about 6/17/02 they mailed copies of the draft lawsuits to district attorneys Elizabeth Wittemeyer and Paul McLimans naming them as defendants. The drafts were detailed about the felonies and other crimes."

372.) Undisputable02-1950fact372 "Despite the additional proof and the attention of being listed as a defendant, the district attorneys again failed to investigate the crimes discussed even though the statutes of limitations had not then expired."

373.) Undisputable02-1950fact373 "Sometime in 2003, "some people in Steamboat" asked McLimans to press criminal charges against Kay Sieverding but he refused because he knew Sieverdings were right and hadn't libeled anyone, or made any extortion attempts."

374.) Undisputable02-1950fact374 "As of the end of the 02-1950 action, Kay Sieverding was still restrained and consequently not free to travel around Steamboat Springs without constant fear of Jane Bennett (nor) volunteer for activities or apply for work that would involve a background check."

375.) Undisputable02-1950fact375 "From September 2000 to October 2002, the Sieverdings approached many lawyers but couldn't find one willing to sue the lawyer tortfeasors."

376.) Undisputable02-1950fact376 "The Sieverdings advertised for a lawyer to contest "government endorsed perjury" but got no responses."

377.) Undisputable02-1950fact377 "On hearing a summary of the case, the lawyers refused to even review it for money."

378.) Undisputable02-1950fact378 "It is impossible for to review even the briefest of summaries of these events and not know that attorney deceit was key."

379.) Undisputable02-1950fact379 "It is impossible to pursue the plaintiffs' case in a vigorous and honest way without addressing the intentional torts by attorneys—the deliberate attorney fraud, libel, and abuse of process."

380.) Undisputable02-1950fact380 "As pro se litigants, the plaintiffs suffer great disadvantages in the legal system including lack of knowledge, greater research burdens, greater vulnerability to criticism of their writings, great time and expense in attending meetings in Denver, more emotional stress in dealing with memories of unpleasant events, less flexibility in communication, and legal restrictions in being reimbursed for their time and expenses."

381) Undisputable02-1950fact381 "A competent attorney is necessary for a plaintiff to have a 'level playing field'."

382.) Undisputable02-1950fact382 "By their policies discouraging attorneys from representing the Sieverdings and other victims of attorneys' misconduct, the CBA and ABA have severely restricted the Sieverdings' access to the courts."

383.) Undisputable02-1950fact383 "Only because of their statistically unusual persistence, resourcefulness, intellectual orientation, (and) computer system are the Sieverdings able to pursue this lawsuit. It is recent that non-lawyers were allowed to subscribe to online legal databases."

384.) Undisputable02-1950fact384 "The defendants obviously did not anticipate that a resourceful plaintiff with the Internet could pursue this case."

385.) Undisputable02-1950fact385 "In fact, (Routt County) Judge Garrecht predicted in 9/6/00 that the Sieverdings would not be able to hire a lawyer for their constitutional claims in Steamboat and that the litigation would be too expensive to pursue."

386.) Undisputable02-1950fact386 "a (previously named) lawyer Kay Sieverding interviewed, advised that her case was impossible to pursue because the feds wouldn't like it and that any lawyer who took her case would be subject to retaliation by other lawyers and local government. She said that when she took a case against local government in a small town in Southern Colorado, the police followed her and her other clients. After hearing the Sieverdings' saga, she apparently abandoned her intent to form a practice in Steamboat and moved away."

387.) Undisputable02-1950fact387 "A lawyer the plaintiffs employed for a while in Steamboat Springs, (previously named) told Kay Sieverding that he would help with depositions and local coordination if they filed in federal court and found a lawyer in Denver."

388.) Undisputable02-1950fact388 "However, (the lawyer previously employed by Sieverdings) told them he would not help with depositions if the Sieverdings sued attorney Randall Klauzer or Anthony Lettunich because it would hurt (his) law practice."

389.) Undisputable02-1950fact389. "The policies and omissions of the ABA and CBA, which prevent them from getting a lawyer to sue a lawyer,.... created a substantial danger for the Sieverdings being unable to secure remedy for their claims, which are substantial and legitimate, because of their legal inexperience and Court prejudice against pro se litigants."

61

390.) Undisputable02-1950fact390 "The CITY is apparently required by state law to maintain insurance to cover damages it inflicts."

391.) Undisputable02-1950fact391 "David Brougham is apparently the only insurance claims agent the City has and he has known (since January 2002 or earlier) that the plaintiffs were damaged."

392.) Undisputable02-1950fact392 "The CITY'S insurance policy includes coverage for its employees committing crimes with about a $10,000 deductible."

393.) Undisputable02-1950fact393 "Some of the plaintiff's claims involve commission of crimes against them by CITY employees."

394.) Undisputable02-1950fact394. "The Sieverdings sent notice of their claims including crimes within the required time frame to the CITY as required."

395.) Undisputable02-1950fact395 "The office of Ken Salazar, CO Attorney General, sent a copy of the Sieverdings' detailed 120 day notice …but at no time did any …claims agent contact the plaintiffs to discuss compensation."

396.) Undisputable02-1950fact396 "David Brougham has repeatedly insulted and threatened the plaintiffs for pursuing their claim and seeking to have their damages compensated. At the (pre written reply) oral conference called by the magistrate 1/30/03, Brougham made false statements of law implying that compensation can be totally and legally denied to victims of intentional torts by government actors."

397.) Undisputable02-1950fact397 "Statistically speaking, the claims agent for CIRSA apparently seldom, if ever, approves payments from CIRSA without litigation except for physical accidents and physical injuries to body."

62

398.) Undisputable02-1950fact398 "In 1995, Brougham apparently forced a citizen whose house was torn down by government employees acting with animus to go to the Colorado Supreme Court without apparently even sending a small check for the citizens' loss of home."

399.) Undisputable02-1950fact399 "The fact that most of the torts committed against the plaintiffs were intentional and therefore merit punitive damages, the amount of which will be determined by a jury, does not excuse the City and its agent from handling its claim in good faith."

400.) Undisputable02-1950fact400 "Because of bad insurance claim litigation involving State Farm, if you are in a car accident you will receive partial compensation without insult or threats even if you have to go to Court to agree on the full amount of compensation appropriate."

401.) Undisputable02-1950fact401 "In January 2003, David Brougham emailed to the Sieverding family that he didn't want to see their "so-called evidence.""

402.) Undisputable02-1950fact402 "David Brougham told the Sieverdings he doesn't want them to contact him by phone, email or fax."

403.) Undisputable02-1950fact403 "In a time frame overlapping their injury of the Sieverding family, the CITY and its politicians and staff, and its insurance agent also deliberately injured another citizen, David Criste, by not allowing him a hardship variance from the setback laws to install small supports for the second floor of his home after his non-affiliated licensed civil engineer made a design error."

404.) Undisputable02-1950fact404 "As in this case, Criste's legitimate claim was not paid."

63

405.) Undisputable02-1950fact405 "David Brougham, CIRSA, and the CITY were able to avoid paying for Criste's damages by doing everything they could to increase his costs and delay claim resolution."

406.) Undisputable02-1950fact406 "David Criste told Kay Sieverding that, before he ran out of money to fight his case, he had a deposition that a witness heard city council member Arianthe Stettner, also a defendant in this case, say that the city defendants in his case planned to "bankrupt" Criste, to avoid paying his claim."

407.) Undisputable02-1950fact407 "When Kay Sieverding suggested to Arianthe Stettner that they get another CITY attorney, she said they "like Tony"."

408.) Undisputable02-1950fact408 "Melinda Sherman said that when she was assistant CITY attorney, 'Tony was always the 'front man, the public face."

409.) Undisputable02-1950fact409 "Richard Tremaine, a partner in the law firm of Klauzer & Tremaine, and a defendant here, was on the City council apparently during the time that Criste's claim was first pending."

410.) Undisputable02-1950fact410 "Tremaine reportedly attempted to solicit funds from Criste and signed Criste's neighbors as customers, on a contingency basis."

411.) Undisputable02-1950fact411 "Anthony Lettunich, CITY attorney, reportedly billed about $87,000 for his successful efforts to avoid paying Criste's claim."

412.) Undisputable02-1950fact412 "David Brougham was apparently was also paid substantially in this successful effort to avoid paying Criste for damages maliciously inflicted upon him after he reportedly 'told off' the City council."

413.) Undisputable02-1950fact413 "Another litigant apparently referred to CIRSA or CES in their pleadings as a 'cess pool'."

414.) Undisputable02-1950fact414 " The bad faith handling of other people's claims taught City actors that they could hurt people without repercussion. David Brougham defamed Kay Sieverding, by saying, in front of her husband and children, Colorado Magistrate Judge Schlatter, and various defense counsel at a (pre written reply oral conference called by magistrate 1/30/03) conference on 1/30/03, "If I were to use defamatory or slanderous language to you today, I'm protected by what I think is qualified privilege" (1/30/03 transcript p52)

415.) Undisputable02-1950fact415 "A few minutes later he said... "asking the district attorneys to bring criminal charges against you for what you had done and the threats you had made, which I thought were clear extortion and would have been the basis for a felony charge" (1/30/03 transcript p 55)

416.) Undisputable02-1950fact416 "The only "threats" Kay Sieverding made were of legal action and David Brougham had reason to know that."

417.) Undisputable02-1950fact417 "ABA and CBA policies and omissions interfering with citizens potential to get a lawyer to sue a lawyer contributed to the Sieverding's vulnerability to losing their liberty and property through illegitimate actions by the CITY, its employees, private attorneys (Klauzer, Horner, Tremaine and their firm) and the local district attorney's office."

418.) Undisputable02-1950fact418 "ABA and CBA policies and omissions interfering with citizens potential to get a lawyer to sue a lawyer made David Brougham, Randall Klauzer, and P. Elizabeth Wittemeyer believe that they could defame Kay Sieverding, with no caution needed."

65

420.) The facts 2-419 are undisputable because the defendants had adequate opportunity to dispute them in the related preceding litigation District of Colorado 02-1950 and did not do so.

421.) $15 million plus interest at the rate of 12% from April 1. 2004 is undisputable as an estimate of economic, personal injury, compensatory, and punitive damages because it was the amended amount in the related preceding litigation District of Colorado 02-1950 where the defendants had adequate opportunity to dispute the estimate however, the defendants through their legal representatives agreed to the amount and interest calculation.

422.) In the related preceding litigation, District of Colorado 02-1950, all parties agreed to accept the liability on a joint and several basis.

423.) All of the defendants in this action were also defendants in the related preceding litigation, and are bound by the choices and strategies of their representatives in that action. Their defendants in that action asserted immunity and res judicata defenses that were not valid and denied that plaintiffs have rights that they definitely do have according to settled law. The result in the related preceding litigation was not based on the merits because there were no statements of stipulated or disputed facts and the defense counsel encouraged and ratified decisions being made at higher courts based on the report and recommendation by Colorado Magistrate Judge A.E. Schlatter even though it misstated both the facts and the law. The 02-1950 defendants intended to subvert the fair administration of justice in the 02-1950 action and cannot benefit from that.

**Claim:** The above facts show willful and wanton concerted effort by the Steamboat Springs based actors to invade the Sieverdings' protected constitutional rights of liberty

66

and property and to retaliate against them for their exercising their first amendment rights. They are all legally responsible under a concerted liability theory because the named Steamboat defendants knowingly aided and abetted criminal and tortuous conduct. The remaining actors, the national and state private bar associations and Hall and Evans LLP were proximate causes to the original events and they recklessly risked plaintiffs' rights. In the 02-1950 litigation, the defendants acted together to intentional interfere with the economic advantage to Sieverdings' of their lawsuit through illegitimate and illegal means that make all the parties jointly and severally liable to the Sieverdings for the undisputed sum certain amount of $15 million plus 12% simple interest accruing from 4/1/2004.

**Demand:**  On a joint and several basis, $15 million plus 12% interest from 4/1/04 awarded to plaintiffs directly, to be split up between them privately, on the basis that the amount and interest were previously litigated and the defense already agreed to that amount.  Any payments or partial payments received from defendants' insurance or individual defendants will be netted from this.

**Verification:** The plaintiffs hereby declare under penalty of perjury that to the best of their knowledge and belief everything included in this document, and all other documents filed with this and all other courts, is true and correct:

David Sieverding          08/20/05          Kay Sieverding  08/20/05

Edward "Ed" Sieverding      08/20/05      Thomas "Tom" Sieverding 08/20/05

Phone for all 608-848-5721,   Fax for all 608-845-3201     Address for all 641 Basswood Ave, Verona, WI 535email for all: Sieverding.kay@slides.com

67

RECEIVED

AUG 2 2 2005


NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT